**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Travelers Indemnity Company, | No. CV-19-03682-PHX-SPL |
| Plaintiff, | **ORDER** |
| vs. | |
| Westfield Insurance Company, | |
| Defendant. | |

Pending before the Court is Plaintiff's Motion for Partial Summary Judgment (the "Motion") (Doc. 20) seeking a declaratory order that Defendant owed a duty to defend Plaintiff's insured, Beazer Homes Sales, Inc. and/or Beazer Homes Holdings, Corp. (collectively "Beazer"), in a prior lawsuit. The Motion is fully briefed, and the ruling of the Court is as follows.[1]

## I. Background

### A. Current Litigation

Plaintiff, The Travelers Indemnity Company ("Travelers"), brought this action in state court on April 26, 2019 seeking declaratory judgment and financial relief against Defendant Westfield Insurance Company ("Westfield") for Westfield's refusal to defend Beazer Homes Sales, Inc. and/or Beazer Homes Holdings, Corp. (collectively "Beazer") in

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. See L.R. Civ. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

a prior construction defect lawsuit brought by 81 homeowners (the "Underlying Action") (*See DeLaurentis v. Beazer*, County of Maricopa case no. CV2013-16948). (Doc. 1-3) Westfield removed the action to federal court. (Doc. 1) In its Motion, Travelers contends that defense counsel for Beazer in the underlying action properly tendered its defense to Westfield in April 2014, which triggered Westfield's duty to defend Beazer. (Doc. 20 at 5) Travelers also contends that Westfield thereafter breached that duty by refusing to defend Beazer in the Underlying Action. (Doc. 20 at 5)

In response to the Motion, Westfield argues that it did not have a duty to defend and that Beazer failed to satisfy its burden to prove it was an additional insured under the relevant insurance policies by way of its three-page tender letter. (Doc. 26 at 8–9) Additionally, Westfield contends that even if Beazer had satisfied that burden, Beazer still had the burden to establish that duty as to each of the 81 homeowners joined in the Underlying Action. (Doc. 26 at 9) The parties agree on the basic facts of the Underlying Action and the relevant insurance policies but disagree as to the significance and relevance of facts available outside the complaint in the Underlying Action and as to the applicable legal standard for the duty to defend.

### B. Implicated Insurance Policies and Subcontracts

The parties agree on the relevant insurance policies which governed Westfield's duty to defend Beazer in the Underlying Action. Westfield entered into successive one-year insurance contracts with VW Dig, LLC ("VW Dig") from 2007 through 2012. (Doc. 20-1, Exs. P, Q. R, S, and T) The contracts contained a Commercial General Liability Coverage Form, which defined who was an insured as VW Dig as an LLC, its members, and its employees. (Doc. 20-1, Exs. P, Q, R, S, and T) The insurance contracts also contained a form entitled "Additional Insured – Owners, Lessees, or Contractors" which amended the definition of "Who is an Insured." (Docs. 20 at 4; 26 at 2) The additional insured form reads:

> **A. Section II - Who Is An Insured** is amended to include as an additional insured any person or organization when you and

such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability caused, in whole or in part, by "your work" performed for that insured and included in the "products-completed operations" hazard. The coverage afforded to the Additional Insured is solely limited to liability specifically resulting from the conduct of the Named Insured, which may be imputed to the Additional Insured.

**B.** This endorsement provides no coverage to the Additional Insured for liability caused, in whole or in part, out of the claimed negligence of the Additional Insured, other than which may be imputed to the Additional Insured by virtue of the conduct of the Named Insured.

(Doc. 27, Ex. G) The Commercial General Liability Form defines "your work" as

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

**(2)** The providing of or failure to provide warnings or instructions.

(Doc. 20-1, Exs. P, Q, R, S, and T) The language of the "products-completed operations" hazard clause includes "all 'bodily injury' and 'property damage' occurring away from

premises you own or rent arising out of 'your product' or 'your work.'" (Doc. 20-1, Exs. P, Q, R, S, and T)

Beazer and VW Dig entered into several subcontracts where VW Dig agreed to act as subcontractor for Beazer to provide dry trenching for the residential development known as Sierra Montana and where Beazer would serve as the general contractor and developer.[2] (Doc. 27, Exs. A, B, C, and D at 1) Each subcontract between VW Dig and Beazer offered into evidence contains an article two entitled "specification of labor and materials", contained on the first page of the subcontract. (Docs. 21, Exs. A–C; 27, Exs. A, B, C, and D at 1) Article two describes all the materials and labor to be furnished by VW Dig for the Sierra Montana project and for each subcontract states:

- Subcontract dated November 17, 2003: provide underground utility trenching (Doc. 27-1, Ex. A at 1);
- Subcontract dated August 11, 2005: provide utility trenching (Doc. 27-1, Ex. B at 1);
- Subcontract dated August 11, 2005: provide sewers, drains, and pipe laying (Doc. 27-1, Ex. C at 1);
- Subcontract dated August 19, 2014: provide utility trenching (Doc. 27-1, Ex. D at 1).

Exhibit E to the subcontract, entitled "Utility Trenching," appears to describe the scope of work in more details. Exhibit E to the November 17, 2003 subcontract states that VW Dig would "supply all secondary lot trenching and conduit . . . supply and install conduit lines from service to power company's J-Box" and "backfill and recompact trenches" with a secondary trench length of 35 feet. (Doc. 27-1 at 19) Exhibit E attached to the August 19, 2004 subcontract contains the same language but for a secondary trenching of 40 feet. (Doc. 27-1 at 39)

---

[2] The exact scope of Beazer's function and title on the project is disputed by the parties but it is not relevant or determinative on the resolution of the Motion.

4

Section 8(g) of the terms and conditions of each subcontract required VW Dig, as subcontractor, to provide an endorsement on its insurance policy which "named [Beazer] as additional insured, but only as respects [sic] to work done by or on behalf of [VW Dig]." (Doc. 20-1, at 6, 26, 43) Additionally, Section 8(l) required VW Dig to provide an endorsement that "such insurance as if afforded under [VW Dig]'s policy is primary insurance as respects [sic] [Beazer] and that nay [sic] other insurance maintained by [Beazer] is excess and non-contributing with the insurance required hereunder." (Doc. 20-1, at 6, 26, 43) The parties have not pointed to such endorsements in the record in the Motion or the associated briefing, but they do not seem to dispute that such endorsements existed. These are the relevant insurance policy and subcontracts which cover this dispute.

**C. Underlying Action**

On December 19, 2013, owners of homes in the Sierra Mountain project brought the Underlying Action against Beazer for breach of the implied warranty of workmanship and habitability, breach of express warranty, and breach of contract. (Doc. 20-1 at 58) Among numerous allegations in the complaint was a failure to adequately provide fill placement and/or compaction. (Doc. 20-1 at 62, ¶ 14(F)). On February 21, 2014, Beazer filed its third-party complaint naming a myriad of subcontractors, including VW Dig, and asking for various kinds of relief such as contribution and indemnification. (Doc. 20-1 at 73) On December 1, 2014, Orion Architectures prepared an expert report on behalf of plaintiffs in the Underlying Action. (Doc. 20-1 at 99–102) Beazer issued reports prepared by the Ward Group and Madsen Kneppers respectively dated April 3, 2015 and April 8, 2015. (Doc. 20-1 at 104–20)

On April 9, 2014, Beazer's defense counsel tendered its defense to Westfield through a letter. (Doc. 20-1 at 135) The letter informed Westfield of the pendency of the Underlying Action and stated that it attached: a copy of VW Dig's subcontract agreement; Additional Insured Certificates and Endorsements; the Purchaser Dwelling Act Notices which plaintiffs had sent to Beazer which contained a Preliminary Defect List and Preliminary Defect and Damage; and the complaint in the Underlying Action. (Doc. 20-1

at 137) On April 23, 2014, Westfield sent a letter to Beazer's counsel stating that it did not have enough information at the time to evaluate the tender letter and asking that Beazer provide "copies of any contract, scope of work, job file materials" which could assist Westfield in its investigation. (Doc. 20-1 at 144) On July 8, 2014, Beazer sent a settlement offer to VW Dig's counsel related to the Underlying Action and VW Dig's work, stating that Beazer's experts ha[d] concluded that VW Dig's work [was] implicated by . . . main water line failure due to improper trenching and backfill; [d]riveway and sidewalk failure due to improper compaction." (Doc. 20-1 at 139–42) The next communication the parties have pointed the Court to in this case is a February 28, 2018 letter from Westfield's counsel addressed to Beazer's counsel. (Doc. 20-1 at 146–49) In the letter, Westfield's counsel denied the presence of a duty to defend under similar arguments it raised in response to the Motion in this case but stated that if Beazer had any more information, Westfield would consider it. (Doc. 20-1 at 146–49)

**II.   Legal Standard**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show[] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Id.* at 249–50 (citations omitted).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323 (citations omitted). The moving party need not disprove matters on which

the opponent has the burden of proof at trial. *Id.* Summary judgment is, therefore, proper if the nonmoving party fails to make a showing sufficient to establish the existence of an essential element of his case on which he will bear the burden of proof at trial. *Id.*

When the moving party has carried its burden, the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*

In the context of summary judgment, the court presumes the nonmoving party's evidence is true and draws all inferences from the evidence in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the nonmoving party produces direct evidence of a genuine issue of fact, the court does not weigh such evidence against the moving party's conflicting evidence, but rather submits the issue to the trier of fact for resolution. *Id.*

### III. Analysis

The Court notes that the parties disagree on two related points of law: the duty to defend and how it is triggered on one hand, and the closely related duty to investigate on the part of the insurer on the other hand. The briefing in this case is not clear and contains some misstatements of the law. For example, Westfield misstates Beazer's burden of proof at the time of tender of the defense. Under Arizona law, an insurer's duty to defend arises "at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable." *Regal Homes, Inc. v. CAN Ins.*, 217 Ariz. 159, 164 (Ct. App. 2007). Such duty arises if the complaint filed against the insured alleges facts that fall within the policy's coverage. *Teufel v. American Family Mutual Ins. Co.*, 244 Ariz. 383, 385 (2018). "If the complaint in the action brought against the insured upon its face alleges facts which come within the coverage of the liability policy, the insurer is obligated to assume the defense of the action, but if the alleged facts fail to bring the case within the

policy coverage, the insurer is free of such obligation." *Kepner v. W. Fire Ins. Co.*, 109 Ariz. 329, 331 (1973) (internal quotations omitted). However, "[t]he duty to defend should focus upon the facts rather than upon the allegations of the complaint which may or may not control the ultimate determination of liability." *Id.* Accordingly, the Court in *Kepner* held that an insurer may refuse to defend against a suit based on facts it knows outside the complaint, even when the facts alleged in the suit would trigger a duty to defend. *Id.*

"If the facts of a complaint would trigger coverage but additional facts not appearing in the complaint would exclude coverage then there is no duty to defend." *Northern Ins. Co. of New York v. Morgan*, 186 Ariz. 33, 35 (Ct. App. 1995) (citing *Kepne*r, 109 Ariz. at 331). In *United States Fidelity & Guaranty Corp. v. Advance Roofing Supply Co.*, 163 Ariz. 476 (Ct. App. 1989), the Arizona appellate court considered an extension of *Kepner*, whether an insurer had a duty to investigate facts outside the complaint when allegations in the complaint did not create a duty to defend. The Court found Arizona law did not impose such a duty to investigate. *Id.* at 480. As the Arizona Court of Appeals explained:

> Although the Arizona decisions clearly give an insurer the right to make a reasonable investigation of the facts in order to avoid a duty to defend ostensibly imposed by the allegations of the complaint, we have found no Arizona authority defining the extent of an insurer's duty to investigate facts outside the allegations of the complaint where, as in this case, those allegations would not impose a duty to defend.

*Id.* The Arizona Court of Appeals went on to quote the Minnesota Supreme Court on the duty to investigate as it found Minnesota's approach to the duty to investigate "sound." Quoting the Minnesota Court:

> [W]hile a liability insurer may initially rely on the allegations of the underlying complaint to determine whether it must provide its insured with a defense, it may not rely on that determination, without investigating facts, once the insured has

> come forward and made some factual showing that the suit is
> actually one for damages resulting from events which do fall
> into policy terms.

*Id.* (internal quotations omitted). Under Arizona law, then, an insurer can rely on the allegations in the complaint to determine its duty to defend but if it chooses, it can also investigate beyond the confines of the complaint to discover facts that may be relevant to its duty to defend analysis. An insurer, under Arizona law, *is not required* to investigate beyond the complaint *unless* the insured provides the insurer with some factual showing that the litigation involves damages that could fall within the relevant insurance policy. Where an insured has not made some factual showing, and an insurer has not investigated, it is simply not reasonable to consider additional information at a later time to determine whether there has been a breach. *Ventana Medical Sys., Inc. v. St. Paul Fire & marine Ins. Co.*, 709 F. Supp. 2d 744, 754 (D. Ariz. 2010) (citing *Granite State Ins. Corp. v. Mountain States Tel & Tel. Co.*, 117 Ariz. 432, 436 (Ct. App. 1977)) (where insurer refuses to defend when coverage was required, insurer breaches contract). "If an insurer refuses to defend and awaits the determination of its obligation in a subsequent proceeding, it acts at its peril, and if it guesses wrong it must bear the consequences of its breach of contract." *Kepner*, 109 Ariz. at 332.

Furthermore, when an insured attempts to make a factual showing, it is not reasonable to "drop hundreds of pages of documents onto the lap of an insurance company—most of which are irrelevant in determining whether coverage is implicated—without pointing to any specific documents or document pages, and expect the insurance company to simply discover on its own whether coverage is implicated." *Tri Star Theme Builders, Inc./PCL Constr. Servs., Inc. v. Hawkeye-Security Ins. Co.*, 653 F. Supp. 2d 973, 983 (D. Ariz. 2009), *reversed on other grounds* 426 Fed. Appx. 506 (9th Cir. 2011).

Beazer was not the named insured under the insurance policy issued by Westfield. Indeed, Westfield insured VW Dig and the only possibility for Beazer to be covered by the Westfield-VW Dig insurance policy was to qualify as an additional insured. When a case

involves the alleged duty to defend an additional insured such as a general contractor, it would make senses that such contractor satisfies its burden of establishing a potential for coverage where the complaint in the action against the additional insured implicates the work of the named insured subcontractor.

Accordingly, under the correct reading of Arizona law, Westfield was obligated to investigate beyond the complaint only if Beazer made some factual showing that the Underlying Action was for damages falling within Westfield's insurance policy as it applied to Beazer as an additional insured.

Applying the law to this case, the resolution of the Motion is straightforward. The Court cannot discern from the briefing what investigation, if any, Westfield engaged in after it received Beazer's April 9, 2014 tender letter. Indeed, attached to the tender letter were the relevant subcontract agreements, the insurance policy, notices of defects by the homeowners, and the complaint in the underlying Action among other documents. (Doc. 20-1 at 145) On its face, the complaint alleges, among a list of defects, issues with a "failure to adequately provide fill placement and/or compaction" which Beazer pointed out in its tender letter (Doc. 20-1 at 62, ¶ 14(F)) VW Dig engaged in dry trenching for the project, which included refilling and compacting the trenches as a final step. Westfield's duty at the time was to compare the allegations of the complaint with the relevant insurance policies. *Kepner*, 109 Ariz. at 331. The parties have not pointed to any evidence of the process Westfield engaged in following receipt of the tender letter. Westfield responded on April 23 stating that it did not have enough information to decide on the tender and asking for the relevant contracts, scope of work, and job file materials. (Doc. 20-1 at 144) The Court finds this response odd given that the tender letter apparently contained all those documents already.

The parties have not pointed to any other communication related to tender of defense between April 23, 2014 and July 8, 2014 when Beazer sent a settlement offer to VW Dig. It is true, as Westfield pointed out in its response to the Motion, that there is no evidence in the record that all the expert reports disclosed in the Underlying Action, and on which

Travelers relies for its argument, were ever sent to Westfield directly. It is also unclear whether Westfield defended VW Dig in the third-party action. Westfield repeats in its response to the Motion that facts govern the duty to defend and not the allegations in a complaint when such allegations do not show that insurance coverage exist. (Doc. 26 at 8) It appears that the fact Westfield relies on is that it received no evidence that VW Dig's work was implicated in any of the alleged defects, which negated Beazer's alleged status as an additional insured based on the policy language. It is true, as Travelers pointed out, that Beazer was not required to prove VW Dig's liability in full to trigger the duty to defend from Westfield at the time of tender. However, the allegations in the complaint, together with the relevant agreements and insurance policies, had to show that VW Dig's work was potentially implicated.

The Court finds that the tender letter sent by Beazer on April 9, 2014, along with its attachments, satisfied that burden and that the subsequent communication from Beazer in July 2014 provided enough factual showing to require Westfield to investigate the facts. Indeed, the insurance policies make it clear that if VW Dig's work caused damages and Beazer was held liable for such damages, the Westfield policy would be triggered to defend and potentially indemnify Beazer. The parties do not dispute that there was a subcontract agreement naming Beazer as additional insured on the Westfield-VW Dig policy. Westfield's argument that Beazer had to prove that VW Dig's work was causally linked to the defects alleged in the complaint is misplaced. Beazer had the duty to provide to Westfield enough information, through its tender letter, the complaint in the Underlying Action, and the relevant insurance policies to show that the claims in the Underlying Action potentially involved VW Dig's work. Westfield apparently looked at the complaint and relevant insurance contracts and decided that VW Dig's work was not implicated, negating Beazer's status as an additional insured. Or maybe it decided to adopt a "wait and see" approach, letting the Underlying Litigation proceed and evidence to turn up which would not link VW Dig's work to any of the alleged defects. Westfield says it did not receive the expert reports but also that such reports do not link VW Dig's work to any of the alleged

defects. Westfield never communicated that basis for its denial until February 2018 where counsel for Westfield in this action explained Westfield's position. As Travelers pointed out, all the attachments sent to Westfield in the tender letter were produced by Westfield in this case, so it clearly had access to them. (Doc. 29 at 6) It is disingenuous from Westfield to argue that it did not have access to any of the Underlying Action's materials and evidence disclosed when VW Dig was its insured and was sued through the third-party complaint filed by Beazer. Furthermore, because of all the evidence produced by Beazer in the form of the insurance contracts, complaint, the expert reports, where Beazer specifically pointed to relevant language, and the settlement letter sent to VW Dig in July 2014, the Court finds that Westfield had a duty to investigate the facts. Westfield has not satisfied its burden to show it engaged in any real investigation and even if it did, did not communicate the basis for its denial of defense to Beazer until 2018, years after the Underlying Action concluded.

The Court also finds Westfield's argument that Beazer had the burden to prove coverage for each of the 81 homes involved unpersuasive. It is true that ultimately, each home may have involved varying degrees of liability for Beazer and VW Dig, but this would have been proved during the Underlying Action, not at the time of the tender of defense by Beazer. This would be akin to asking Beazer to wait for the Underlying Action to proceed up until, and if, VW Dig was found liable on any of the 81 homes and then tender its defense to Westfield. This is not the law.

The Court finds that Westfield had a duty to defend Beazer in the Underlying Action as additional insured under the Westfield-VW Dig insurance policy. Indeed, such duty is different from Westfield's argument that "the facts at the time of the [Underlying Action] showed VW Dig's work did not cause Beazer to be liable to any of the 81 different homeowners." (Doc. 26 at 10) Such facts appear to include the declaration of the operations manager who visited the construction site during the Underlying Action and opined that VW Dig's work was not linked to any of the alleged defects. This might very well be true, but those facts were known long after the tender of defense by Beazer. Such facts maybe established that VW Dig did not cause damages, but they are relevant after the duty to

defend was triggered. Westfield had the duty to defend Beazer and in doing so, would have proved to the homeowners that VW Dig was not one of the liable subcontractors through such evidence or other evidence. Accordingly, the Court will grant Travelers's Motion for Partial Summary Judgment on declaratory relief as to Westfield's duty to defend.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 20) is **granted in full**.

Dated this 1st day of April, 2020.

Honorable Steven P. Logan
United States District Judge